## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MANUEL A. AYALA,

       Petitioner,

v.                             CASE NO. 8:18-cv-2644-TPB-TGW

SECRETARY, DEPARTMENT
OF CORRECTIONS,

       Respondent.

_____/

### ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Manuel A. Ayala petitions under 28 U.S.C. § 2254 for a writ of habeas corpus and challenges his state court convictions for burglary of a conveyance, petit theft, and fraudulent use of a credit card.  (Doc. 1)  The Respondent admits that the petition is timely but asserts that some grounds are unexhausted and procedurally barred.  (Doc. 8 at 2, 14–33)  After reviewing the petition, the response, the relevant state court record, and the reply (Doc. 23), the Court finds as follows:

### Factual and Procedural Background

An information charged Ayala with burglary of an occupied conveyance, robbery by sudden snatching, and fraudulent use of a credit card.  (Doc. 8-2 at 179–81)  At trial, Ronald Morton testified that, on October 7, 2010, he and his mother, who was eighty-seven, went to the mall to purchase a gift.  (Doc. 8-3 at 128–29, 133)  After purchasing the gift, Morton and his mother returned to

1

Morton's car parked in the mall's parking lot.  (Doc. 8-3 at 129)  While Morton

assisted his elderly mother into the passenger seat of the car, a male exited a

parked car and offered to help Morton.  (Doc. 8-3 at 130)  Morton refused the offer,

and the male opened the driver's side door of Morton's car, snatched from the

console a fanny pack that belonged to Morton's mother, said, "Excuse me, ma'am,

but you're not going to be needing this anymore," and ran toward a nearby

pharmacy.  (Doc. 8-3 at 130–32)  Morton replied, "On, no you don't," and chased

after the male, but was unable to catch him.  (Doc. 8-3 at 131–32)  Morton's mother

immediately called 911 and described the person who snatched the fanny pack.

(Doc. 8-3 at 135–40)

 Records from a nearby Walmart showed that, on October 7, 2010, the day

when the purse snatching occurred, a person purchased items for $29.58 with a

credit card that belonged to Morton's mother.  (Doc. 8-3 at 172–76)  The person

attempted to use the credit card three more times to purchase more items, but the

transactions declined.  (Doc. 8-3 at 176–81, 190)  Surveillance video from Walmart

captured the person who used the credit card.  (Doc. 8-3 at 185–91)  A sheriff's

deputy identified Ayala as the person in the surveillance video.  (Doc. 8-3 at 145–46)

Ayala, who agreed to meet with the deputy, identified the person who snatched the

fanny pack as Michael Branson.  (Doc. 8-3 at 146)

 After waiving his constitutional rights, Ayala told a detective that Branson

stole a purse from a woman, returned to Ayala's car, which was parked next to the

pharmacy, and told Ayala, "Let's go."  (Doc. 8-3 at 156–60)  Ayala denied observing

Branson snatch the purse because Ayala was sitting in his car parked at the

pharmacy.  (Doc. 8-3 at 158–59)  Branson told Ayala that, when he reached into the

car to snatch the purse, he told the woman, "I have to have that," and a male

responded, "Oh no, you don't, you bastard."  (Doc. 8-3 at 158–60)  While Ayala drove

to Walmart, Branson removed from the purse credit cards, Social Security cards,

and identification cards that belonged to a male and a female.  (Doc. 8-3 at 160)

Ayala admitted that he purchased items at Walmart with a credit card from the

purse and forged the signature of Bobbie Morton, Morton's mother, on a receipt.

(Doc. 8-3 at 161–62)

During the interrogation, Ayala denied that he knew that Branson intended

to steal the purse (Doc. 8-3 at 162–63)[1]:

| | |
|---|---|
| [Detective:] | Let me ask you this. What was your reasoning to go to Macy's that day? |
| [Ayala:] | We was just driving. |
| [Detective:] | Why? |
| [Ayala:] | Because, you know, I — I enjoy to drive, but — |

---

[1] This quotation derives from the trial transcript. (Doc. 8-3 at 162–63) During trial, the prosecutor played an audio recording of the interrogation. (Doc. 8-3 at 156–64) The record contains a transcript of the interrogation prepared by the prosecutor before trial with redactions proposed by the prosecutor. (Doc. 8-4 at 200–01) Also, the Respondent supplemented the record in this case with the unredacted audio recording. (Doc. 25) Because the parties agreed to redact other statements that the prosecutor did not initially propose, the transcript prepared by the prosecutor does not accurately represent the recording played during trial.

| | |
|---|---|
| [Detective:] | I mean — because it just seems odd that you would — you would just drop somebody off at the Macy's parking lot. |
| [Ayala:] | Right.[2] |
| [Detective:] | You know, I mean, let's — let's be honest. |
| [Ayala:] | (Unintelligible) |
| [Detective:] | You knew what was — you knew what he was going to do. I mean — or you had the idea of what he was going to do, correct? |
| [Ayala:] | Yeah. |
| [Detective:] | Okay. |
| [Ayala:] | I — I had an idea he was going to do something. I didn't know if it was to snatch a purse. I don't know if it was — |
| [Detective:] | (Unintelligible) — but you knew he was going to do some kind of criminal act that you didn't want to be a part of? |
| [Ayala:] | Yeah, I didn't. |
| [Detective:] | But you ended up inadvertently being a part of it, I guess? |
| [Ayala:] | (Unintelligible) |
| [Detective:] | All right. Do you have anything else you'd like to add to this interview? |
| [Ayala:] | Yeah. I mean, I didn't — I didn't snatch no purse. And I was stuck, man. |

---

[2] The trial transcript states that Ayala said, "Right." (Doc. 8-3 at 162) The transcript prepared by the prosecutor states that the detective said, "Right." (Doc. 8-4 at 200) This discrepancy does not affect this Court's ruling on Ayala's claims.

During the defense's case, Branson, who was a thirteen-time convicted felon, testified that, before the robbery, he had asked Ayala to sell pills for him and return with one hundred dollars and crack cocaine. (Doc. 8-3 at 241–42, 246) He contended that Ayala returned with one hundred dollars, fifty dollars of crack cocaine, and a bag of powder that was not cocaine. (Doc. 8-3 at 242) Branson believed that Ayala had kept some cocaine for himself and told Ayala that "one way or another, it's either going to be [your] ass, or I'm going to get my money, one of the two." (Doc. 8-3 at 243, 249) Branson insisted that Ayala repay him by using credit cards to purchase items for him. (Doc. 8-3 at 243–44)

Branson told Ayala to drive him to the mall where he intended to get money and drugs from a female. (Doc. 8-3 at 244–45) Branson directed Ayala to drop him off and park a few blocks away because he did not want Ayala and the female to see each other. (Doc. 8-3 at 244–45) Branson claimed that he exited the car with the intent to steal items from a department store at the mall but saw the purse inside Morton's car and instead snatched it. (Doc. 8-3 at 244–45, 250) When Branson returned to Ayala's car, he gave Ayala credit cards from the purse and told Ayala to purchase items with the cards to repay him for the crack cocaine. (Doc. 8-3 at 245–46) Branson told Ayala that the female whom he just met gave him the credit cards. (Doc. 8-3 at 251–53) Branson, who was taller and larger than Ayala, threatened Ayala and told him that he could not run away because Branson knew where Ayala's sister and aunt lived. (Doc. 8-3 at 246–47)

Ayala, who was convicted of six felonies and thirteen crimes of dishonesty, testified that Branson said that he planned to get money and drugs from a female at a department store at the mall.  (Doc. 8-3 at 257–59, 265–66)  Branson told Ayala to park a block away because Branson did not want Ayala to see the female.  (Doc. 8-3 at 257–58)  After a few minutes, Branson returned to the car and told Ayala, "Let's get out of here."  (Doc. 8-3 at 258)  Branson demanded that Ayala use the credit cards to repay him for the cocaine.  (Doc. 8-3 at 258–59)  Branson told Ayala that "one of [Branson's] drug sources" gave him the credit cards.  (Doc. 8-3 at 267)  Ayala claimed that he complied with Branson's demand because he feared that Branson would harm him, his aunt, and his sister.  (Doc. 8-3 at 259–60, 267–68)  Ayala denied that he knew that Branson intended to steal the purse when Branson exited his car.  (Doc. 8-3 at 263)  Ayala claimed that he felt extremely tired during the interrogation and that the detectives mischaracterized his statements and failed to ask relevant questions.  (Doc. 8-3 at 260–63, 273–74, 278, 281–82)  During rebuttal, the detective who interrogated Ayala testified that during the interrogation Ayala never stated that Branson intended to get drugs and money from a female at the department store.  (Doc. 8-3 at 288)

A jury found Ayala guilty of the crimes (Doc. 8-2 at 203), and the trial judge sentenced Ayala as a habitual violent felony offender to thirty years in prison for the burglary conviction, time served for the petit theft conviction, and a consecutive ten years in prison for the fraudulent use of a credit card conviction.  (Doc. 9-2 at

146–55)  Ayala appealed, and the state appellate court affirmed.  (Doc. 8-2 at 41)

Ayala filed a petition alleging ineffective assistance of appellate counsel, and the

state appellate court denied relief.  (Doc. 8-4 at 19)  Ayala filed a motion for post-

conviction relief, the post-conviction court denied relief without an evidentiary

hearing (Doc. 8-4 at 238–39), and the state appellate court affirmed.  (Doc. 8-4 at

27)  Ayala's federal petition follows.

## **Legal Standards**

### A.    **AEDPA**

Because Ayala filed his federal petition after the enactment of the

Antiterrorism and Effective Death Penalty Act of 1996, AEDPA governs the review

of his claims.  *Lindh v. Murphy*, 521 U.S. 320, 336–37 (1997).  AEDPA modified

28 U.S.C. § 2254(d) and created a highly deferential standard for federal court

review of a state court adjudication:

> An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not
> be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of
> the claim —
>
> (1)    resulted in a decision that was contrary to, or
>        involved an unreasonable application of, clearly
>        established Federal law, as determined by the
>        Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an
>        unreasonable determination of the facts in light
>        of the evidence presented in the State court
>        proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), interprets this constraint on the power of the federal habeas court to grant a state prisoner's petition:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

Clearly established federal law refers to "the holdings, as opposed to the dicta, of [the U.S. Supreme Court Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

"The focus . . . is on whether the state court's application of clearly established law is objectively unreasonable . . . ." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

A factual determination by the state court is not unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). A federal habeas court may grant relief "only if, in light of the evidence presented in the state court proceedings, no reasonable jurist would agree with the factual determinations upon which the

state court decision is based." *Raleigh v. Sec'y, Fla. Dep't Corrs.*, 827 F.3d 938, 948–49 (11th Cir. 2016). Also, a state court's factual determination is presumed correct, and a petitioner carries the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell*, 535 U.S. at 693. Consequently, "review under [Section] 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 181.

If the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons in the opinion and defers to those reasons if reasonable. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). If the last state court decision is without reasons, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." 584 U.S. at 125.

## B.    Ineffective Assistance of Counsel

Ayala asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984), explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so

> serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"[T]here is no reason for a court deciding an ineffective assistance of counsel claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To meet this burden the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. A defendant cannot meet his burden by showing that

the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (quoting *Johnson v. Sec'y, Dep't Corrs.*, 643 F.3d 907, 911 (11th Cir. 2011)).

## C.    Exhaustion and Procedural Default

A petitioner must exhaust the remedies available in state court before a federal court can grant relief on federal habeas. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard v. Connor*, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

A federal court may stay — or dismiss without prejudice — a habeas case to allow a petitioner to return to state court to exhaust a claim. *Rhines v. Weber*, 544 U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982). If the state court would deny the claim as procedurally barred under state law, the federal court instead

denies the claim as procedurally barred on federal habeas. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

A federal court also denies a claim as procedurally barred if the state court denied the claim on an independent and adequate state procedural ground. *Coleman*, 501 U.S. at 729–30. The last state court reviewing the federal claim must clearly and expressly state that the ruling rests on the state procedural bar. *Harris v. Reed*, 489 U.S. 255, 263 (1989). If the last state court rejected the federal claim in an unexplained decision, the federal habeas court looks through the unexplained decision to the last reasoned order to rule on the claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). If the last reasoned order imposed the state procedural bar, the federal court presumes that the later unexplained decision did not silently disregard the bar and consider the merits. 501 U.S. at 803.

A petitioner may excuse a procedural bar on federal habeas either by showing either cause and actual prejudice from the alleged violation of federal law or a miscarriage of justice based on actual innocence. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *House v. Bell*, 547 U.S. 518, 536–37 (2006).

# Analysis

## Ground One

Ayala asserts that trial counsel deficiently performed by not objecting to the admission of Ayala's statements during the audio-recorded interrogation that described other crimes. (Docs. 1 at 5 and 2 at 11–12) The post-conviction court denied the claim as follows (Doc. 8-4 at 238–39) (state court record citations omitted):

> Defendant argues that trial counsel was ineffective for failing to object to unredacted portions of the Defendant's statement that referenced other crimes. Defendant argues that the portion of the statement regarding the purse snatching at Macy's should have been redacted. The Court finds that that particular portion of the statement was relevant as the Defendant was charged with burglary of an occupied structure or conveyance and robbery by sudden snatching. The allegation was that the Defendant's co-defendant, Michael Branson, committed the crime while the Defendant waited in a getaway vehicle. The State showed, through the Defendant's statement, that the Defendant was aware that the co-defendant was going to Macy's to commit a crime. The Court finds that trial counsel was not ineffective for failing to have relevant portions of the Defendant's statement redacted.

Ayala attached to his motion for post-conviction relief an unredacted transcript of the interrogation. (Doc. 8-4 at 183–204) During the interrogation, detectives asked Ayala about four separate purse snatchings. (Doc. 8-4 at 183–204) One of the detectives described the crimes as "a string of [ ] purse snatchings that have occurred in the Winter Haven [and] Lake Wales area." (Doc. 8-4 at 185) Also, the detective described the crimes as "serial robberies" or "consecutive robberies over several days." (Doc. 8-4 at 202) The first purse snatching occurred in the

parking lot of a First Mortgage bank (Doc. 8-4 at 185–90), the second and third purse snatchings occurred in the parking lot of a Macy's department store, (Doc. 8-4 at 191–200), and the fourth purse snatching occurred at a mall.  (Doc. 8-4 at 201–02)

An information in this case charged Ayala for the second purse snatching that occurred in the Macy's parking lot.  (Doc. 8-2 at 179)  Before the prosecutor introduced into evidence at trial the audio recording of the interrogation, the parties agreed to redact the statements that described the other purse snatchings. (Doc. 8-4 at 184, 185–90, 194–200, 201–04)

Ayala told the detectives that, during the second purse snatching, Branson stole a purse from a woman in the Macy's parking lot, returned to Ayala's car, and told Ayala to drive away.  (Doc. 8-4 at 191–92)  Ayala admitted that, later that day, he used a credit card from the stolen purse to purchase items at Walmart.  (Doc. 8-4 at 192–94)  In a redacted portion of the interrogation, Ayala told the detectives, that during the third purse snatching, he drove his girlfriend, Branson, and a male named Jeff to the Macy's parking lot, Jeff exited the car and returned with a stolen purse, and Branson told Ayala to drive away.  (Doc. 8-4 at 194–97)  Ayala admitted that he used a credit card from the stolen purse to purchase gasoline and items at Walmart.  (Doc. 8-4 at 196–99)

Just after the redacted portion of Ayala's discussion of the third purse snatching, the parties agreed to redact Ayala's discussion with the detective as

follows  (Docs. 8-3 at 162–63 and 8-4 at 200–01) (identifying the redacted

statements as bolded and underlined):

| | |
|---|---|
| [Detective #1:] | Let me ask you this, what was your reasoning to go to Macy's that day? |
| [Ayala:] | We was just driving. |
| [Detective #1:] | Why? |
| [Ayala:] | Cause, you know, I like, I enjoy to drive, but ah — |
| **[Detective #1:]** | **Were you look, I mean, were they look, were they out looking to [ ] find victims to do these robberies?** |
| **[Ayala:]** | **At first, they wanted to break into cars for the, for the GPS's, and stuff like that.** |
| **[Detective #1:]** | **[Uh, huh.]** |
| **[Ayala:]** | **Then, it got flipped.** |
| **[Detective #1:]** | **Flipped into doing these robberies?** |
| **[Ayala:]** | **[Uh, huh.]** |
| **[Detective #1:]** | **So, everyday y'all went out, the gig was to go do a robbery?** |
| **[Ayala:]** | **[Uh,] no, well, at a couple of 'em.** |
| [Detective #1:] | I mean, because it just seems odd that you would, you would just drop somebody off at the Macy's parking lot, you know. |
| [Detective #2:] | Right, I mean, let's, let's be honest — |
| [Ayala:] | No, they, they — |
| [Detective #2:] | You knew what was, you knew what he was [going to] do, I mean. |

| [Detective #1:] | Or you had the idea of what he was going to do? Correct? |
|---|---|
| [Ayala:] | Yeah. |
| [Detective #1:] | Okay. |
| [Ayala:] | I had, I had an idea that he was going to do something[.] I don't know if he was to snatch a purse, I don't know if it was **to go break in a car** — |
| [Detective #1:] | **Break in a car,** but you knew he was going to do some kind of criminal act that you didn't want to be a part of. |
| [Ayala:] | Yeah, I didn't. |
| [Detective #1:] | But you ended up inadvertently being a part of it, I guess. |
| [Ayala:] | I [ ] got stuck in it. |

The post-conviction court determined that the unredacted statements in this portion of the interrogation were relevant to the crimes charged in this case. (Doc. 8-4 at 238–39)  Whether evidence is relevant is an issue of state law, and a state court's determination of state law receives deference in federal court. § 90.401, Fla. Stat.  *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985) ("The federal courts must defer to a state court's interpretation of its own rules of evidence and procedure.").

"Collateral crime evidence, regardless of its status as similar or dissimilar fact evidence, is admissible if it is inextricably intertwined with the charged crime." *Richardson v. State*, 338 So. 3d 1106, 1117 (Fla. 1st DCA 2022).  "Collateral crime evidence is inextricably intertwined if it is 'necessary to (1) adequately describe the

deed; (2) provide an intelligent account of the crimes charged; (3) establish the entire context out of which the charged crimes arose; or (4) adequately describe the events leading up to the charged crimes.'" *Richardson*, 338 So. 3d at 1117 (citation omitted).

The unredacted portion of the interrogation refers to both the second purse snatching, charged in this case, and the third purse snatching. However, admission of the unredacted portion of the interrogation was necessary to provide an intelligent account of the crimes charged and establish the entire context out of which the crimes arose. *Richardson*, 338 So. 3d at 1117. In opening statements, the defense disputed that Ayala knew that Branson would commit the second purse snatching before the crime occurred (Doc. 8-3 at 123–24):

> [Trial counsel:]    As you heard from [the prosecutor], Mr. Michael Branson went into the parking lot there, and took Ms. Morton's fanny pack out of the car with Ms. Morton and her son there. In other words, he made this theft with two adults present.
>
> And you will actually hear from Mr. Michael Branson [who will] tell you what you logically must infer from that fact: that he did not have a plan to steal that purse, but it was [ ] spur-of-the-moment. Because a person doesn't plan to steal something with adult witnesses around. That's perhaps the central fact of this case.
>
> Since Mr. Branson didn't have a plan, neither could Mr. Ayala. Mr. Ayala was sitting in his car about a block and a half away, and he had no clue that

> Mr. Branson was going to steal this fanny
> pack.

Without the unredacted portion of the interrogation, which established that Ayala knew that Branson wanted to commit some criminal act, the prosecutor could not rebut this theory of the defense.

The detective first asked Ayala why he went to the Macy's parking lot on "that day." (Doc. 8-3 at 162) The detective's first question referred to the third purse snatching because, immediately prior to the question, Ayala discussed the third purse snatching, which occurred at the Macy's parking lot with Ayala's girlfriend, Branson, and the male named Jeff. (Doc. 8-3 at 194–200) However, Ayala's response to the question was exculpatory because he claimed that he went to the parking lot because he enjoyed driving. (Doc. 8-3 at 162)

After the first question, the detective asked Ayala questions about the "robberies" and the plan to commit "robberies." (Doc. 8-4 at 200) The parties agreed to redact these questions about the "robberies." (Doc. 8-3 at 162) After the redacted statements about the "robberies," the detective again asked Ayala why he would drop a person off at the Macy's parking lot. (Doc. 8-4 at 200–01) Taken in context, these subsequent questions about the Macy's parking lot referred to both the second purse snatching, charged in the information, and the third purse snatching. Both the second purse snatching and the third purse snatching occurred in the Macy's parking lot. Ayala's responses to these subsequent questions about the Macy's parking lot tended to prove that Ayala "had a conscious intent that the

criminal act be done."  (Doc. 8-3 at 321)  *Gosciminski v. State*, 132 So. 3d 678, 694
(Fla. 2013) ("'[T]o prove its case, the State is entitled to present evidence which
paints an accurate picture of the events surrounding the crimes charged.'") (citation
omitted).  *Smith v. State*, 126 So. 3d 1038, 1046 (Fla. 2013) ("In addition to
establishing the context of the charged offense, dissimilar fact evidence may also be
relevant if it is probative of the defendant's state of mind at the time of the charged
offense.").

The trial judge admitted portions of the interrogation relevant to the second
purse snatching charged in this case and carefully excised portions that directly
described the other purse snatchings.  Because the danger of unfair prejudice did
not substantially outweigh the probative value of the unredacted portion of the
interrogation, the post-conviction court did not unreasonably deny the claim.
*Smith*, 126 So. 3d at 1046 ("The limit on the admissibility of relevant dissimilar fact
evidence is that the State is not permitted to 'make the evidence of other crimes the
feature of the trial or to introduce the evidence *solely* for the purpose of showing bad
character or propensity, . . . and such evidence, even if relevant, should not be
admitted if its probative value is substantially outweighed by undue prejudice.'")
(citation omitted and italics in original).  Ground One is denied.

**Ground Two**

Ayala asserts that trial counsel deficiently performed by not requesting a jury instruction that supports an independent act defense. (Docs. 1 at 7 and 2 at 20–23) The post-conviction court denied the claim as follows (Doc. 8-4 at 239):

> Defendant argues that trial counsel was ineffective for failing to request the independent act jury instruction. An independent act occurs when someone other than the defendant commits or attempts to commit a crime (1) which the defendant did not intend to occur, and (2) in which the defendant did not participate, and (3) which was outside of and not a reasonably foreseeable consequence of the common design. In this case the Defendant knew that the co-defendant wanted to go to Macy's to commit some crime and Defendant drove the co-defendant to Macy's, and then away from Macy's once the crime was committed. As such, the Court does not find deficient performance or prejudice.

"Whether the jury instructions were correct is a matter of state law, [and a federal court] must defer to the state courts' construction of that law." *Bilotti v. Fla. Dep't Corrs.*, No. 23-11759, 2025 WL 1088015 at *12 (11th Cir. April 11, 2025).

Florida Standard Criminal Jury Instruction 3.6(l) (2013) defines the independent act defense as follows:

> If you find that the crime alleged was committed, an issue in this case is whether the crime [alleged] was an independent act of a person other than the defendant.
>
> An independent act occurs when a person other than the defendant commits or attempts to commit a crime
>
> 1. which the defendant did not intend to occur, and
>
> 2. in which the defendant did not participate, and

3. which was outside of and not a reasonably foreseeable consequence of the common design or unlawful act contemplated by the defendant.

If you find the defendant was not present when the crime [alleged] occurred, that, in and of itself, does not establish that the [crime alleged] was an independent act of another.

If you find that the [crime alleged] was an independent act of [another], then you should find [the defendant] not guilty of the crime [alleged].

At trial, Ayala testified that he drove Branson to the Macy's parking lot

because Branson told him that he needed to meet a female about money and drugs

(Doc. 8-3 at 257):

| | |
|---|---|
| [Trial counsel:] | Now, sir, we've heard about this episode that occurred on October 7th. When — do you agree that you drove Mr. Branson and dropped him off at the Macy's parking lot? |
| [Ayala:] | Yes, sir, I did. |
| [Trial counsel:] | Okay. And what was your understanding of what he was going to do there? |
| [Ayala:] | He was supposed to — according to him — he told me he was going to go see some girl about some money and some dope. |
| [Trial counsel:] | Okay. And did you have any way of verifying that? |
| [Ayala:] | No. |
| [Trial counsel:] | All right. And did he ask you to stay right there at the scene or to park up ahead? Or what was — |
| [Ayala:] | No. He told me to go to the next block over because he didn't want me to see her. |
| [Trial counsel:] | Okay. So, you did park there? |

|                    |                                                                                                                                                                                                                                         |
| ------------------ | --------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| [Ayala:]           | Yes, sir.                                                                                                                                                                                                                                |

Ayala testified that Branson returned to the car with a purse, told him to drive away, instructed him to use credit cards in the purse to purchase items at a Walmart, and threatened to harm him if he did not comply (Doc. 8-3 at 258–59):

|                    |                                                                                                                                                                                                                                         |
| ------------------ | --------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| [Trial counsel:]   | All right. And at some point, what was — what was the next thing you knew with Mr. Branson?                                                                                                                                               |
| [Ayala:]           | A few minutes later, he came to the car. And he told me — he said, "Let's get out of here."                                                                                                                                              |
| [Trial counsel:]   | Okay.                                                                                                                                                                                                                                    |
| [Ayala:]           | So I drove off. After that, he put — he got some credit cards, you know. And he started making some — some comments.                                                                                                                     |
| [Trial counsel:]   | Let me ask you — you heard him, obviously, talk about some drug delivery that he had — he had had you do for him, correct?                                                                                                                |
| [Ayala:]           | Yes. Yes, sir.                                                                                                                                                                                                                           |
| [Trial counsel:]   | Tell us your recollection.                                                                                                                                                                                                               |
| [Ayala:]           | Well, it — I wasn't selling. I was — it was an agreement between her — one of the girls in the hotel room. I just made the delivery. When I came back with it, you know, I just — I gave him what they gave me for them. And he blew his lid. |
| [Trial counsel:]   | Okay. He was upset with you?                                                                                                                                                                                                             |
| [Ayala:]           | He just got very upset.                                                                                                                                                                                                                  |
| [Trial counsel:]   | But he told you that he was going to the parking lot to meet the drug girl?                                                                                                                                                              |

| [Ayala:] | He said he was going to meet some girl. I don't — I don't — I don't think it was the parking lot. I think it was at Macy's, but — |
|---|---|
| [Trial counsel:] | All right. So, he came back to the car. What did — and he had some credit cards? |
| [Ayala:] | Yes, sir. |
| [Trial counsel:] | And what did he say to you? |
| [Ayala:] | Practically — he practically ordered me to clean my face, to get — to go pay back the money that I — he supposedly felt that I — that I owed him. |
| [Trial counsel:] | All right. Did he threaten you? |
| [Ayala:] | Yes, sir, he did. |
| [Trial counsel:] | All right. Did you feel he had the capacity to carry out those threats to you? |
| [Ayala:] | Oh, yes, sir, he did. |
| [Trial counsel:] | Did you feel like you were in fear of great bodily harm? |
| [Ayala:] | (Nods head affirmatively). I was very afraid. |

Ayala testified that he did not know that Branson intended to snatch a purse in the parking lot and that he used the credit card because Branson threatened him. (Doc. 8-3 at 263, 272, 274, 278, 280)

Also, Branson testified that he asked Ayala to drive him to the Macy's department store because he needed to get some money and some drugs from a female. (Doc. 8-3 at 244) Branson testified that he did not intend to meet the

female and instead intended to steal items from the department store.  (Doc. 8-3 at 244–45)  Branson testified that, while walking in the parking lot toward the store, he saw the purse in the car, snatched the purse, and ran back to Ayala's car.  (Doc. 8-3 at 244–45)

"The independent act doctrine 'arises when one co-felon, who previously participated in a common plan, does not participate in acts committed by his co-felon, which fall outside of, and are foreign to, the common design of the original collaboration.'"  *Williams v. State*, 34 So. 3d 768, 772 (Fla. 2d DCA 2010) (quoting *Ray v. State*, 755 So. 2d 604, 609 (Fla. 2000)).  The instruction requires "some evidence of a common design or common unlawful act."  *Williams*, 34 So. 3d at 772.

Ayala testified that Branson asked him to drive to the parking lot because Branson "was going to see some girl about some money and some dope."  (Doc. 8-3 at 257)  Ayala denied that he had "any way of verifying that."  (Doc. 8-3 at 257)  Ayala testified that, when he reached the parking lot, Branson asked him "to go to the next block over because [Branson] didn't want [him] to see her."  (Doc. 8-3 at 257)  Also, Branson testified that he told Ayala, "Come on[,] [t]ake me over here so I can pick up some money and some dope from this girl from the Macy's."  (Doc. 8-3 at 244)  Branson testified that he "told [Ayala] to drop [him] off" and "to wait a couple blocks over" because "[he] didn't want [Ayala] seeing her and didn't want her seeing [Ayala]."  (Doc. 8-3 at 244–45)

During the interrogation, Ayala told the detective that he did not witness
what occurred in the parking lot because he remained inside his parked car at a
nearby Walgreens pharmacy.  (Doc. 8-3 at 158–59)  Ayala told the detective that he
"knew [that Branson] was going to do some kind of criminal act," but qualified his
admission by stating that "[he] didn't want to be a part of" that criminal act.  (Doc.
8-3 at 163)

Ayala did not testify that he intended purchase drugs with Branson or
intended to receive payment for giving Branson a ride to purchase drugs.  Ayala did
not testify that he agreed to act as either a courier or a lookout for the drug
transaction at the Macy's parking lot.  Ayala denied observing what occurred in the
parking lot because he parked at least one block away at the pharmacy and denied
that he intended to participate in the transaction.  During the interrogation, he
described himself as "stuck."  (Doc. 8-3 at 163)  Because Ayala was merely present a
block away from the Macy's parking lot and because Ayala did not intend to
participate in any crime, Ayala failed to present evidence, viewed in the light most
favorable to the defense, that he and Branson had "a common design or a common
unlawful purpose" to purchase or sell drugs.  *Harris v. State*, 501 So. 2d 735, 736
(Fla. 3d DCA 1987) ("[K]nowledge that an offense is being committed is not the
functional equivalent of being a participant in the crime with the requisite criminal
intent.  It is likewise firmly established that mere presence at the scene of the crime
is not sufficient to prove one's participation in it.") (citations omitted); *Sanders v.*

*State*, 563 So. 2d 781, 782 (Fla. 1st DCA 1990) ("'Neither mere knowledge that an offense is being committed nor presence at the scene of the crime and flight therefrom are sufficient to establish participation with the requisite criminal intent.'") (citation omitted).

If Ayala had testified that he and Branson agreed to go to the parking lot to purchase or sell drugs, and Branson chose to deviate from the plan and commit the purse snatching, the independent act defense would apply. *Harvey v. State*, 26 So. 3d 685, 687 (Fla. 5th DCA 2010) ("The defendant testified that he only intended to participate in the sale of marijuana, and that the robbery and resulting murder were independent acts of his co-felons. The defendant maintained that position during his police interviews and throughout the trial. . . . While the evidence presented was sufficient to convict the defendant as charged, evidence was presented which supported the defendant's theory that the robbery, and thus the murder, were independent acts from the original plan to sell the marijuana.").

*Williams*, 34 So. 3d at 772, explains why a defendant must present some evidence of an unlawful common plan, separate from the charged offense, to receive an independent act instruction:

> We interpret the independent act instruction to require some evidence of a common design or common unlawful act. The State claims the three men went to the scene of the crime to engage in a brawl with all comers. Mr. Williams claims that he simply got into a fight with Desmond Ball after he arrived, that one of the other occupants fought Rudell Ball, and that, overall, the occupants of the car had no common plan. In the absence of any evidence of a common plan to batter Desmond Ball but not

Rudell Ball, the trial court did not abuse its discretion in
declining to give an independent act instruction.

To the extent that Mr. Williams argues that he was entitled to
the independent act instruction because there was evidence
that he committed a separate "unlawful act," we believe
Mr. Williams is reading too much into the jury instruction. The
caselaw in which this instruction is given does not appear to
contain an example of a crime where the defendant had no
common plan to commit some crime. For example, *Calabrese*,
886 So. 2d at 398–99, dealt with a conspiracy to buy and,
allegedly, traffic in cocaine; *Barfield*, 762 So. 2d at 565,
involved a plan to steal an ATM. For the reasons explained
above, we conclude the instruction is describing a "common
. . . unlawful act contemplated by the defendant." It is this
common plan or act from which the charged offense is urged to
be "independent." If this were not the case, then a defendant
would be entitled to both an instruction on principals and one
on independent act in most, if not all, cases in which the
principals instruction is given.

Because Ayala contended that he was merely present near the scene where

the crime occurred and denied that he intended to participate in any crime, the

principal instruction given by the trial judge adequately described his defense based

on innocence (Doc. 8-3 at 321):

If the defendant helped another person or persons commit a
crime, the defendant is a principal and must be treated as if he
had done all the things the other person or persons did if, one,
the defendant had a conscious intent that the criminal act be
done and, two, the defendant did some act or said some word
which was intended to and which did incite, cause, encourage,
assist, or advise the other person or persons to actually commit
the crime.

To be a principal, the defendant does not have to be present
when the crime is committed.

During closing, trial counsel relied on this instruction to argue that Ayala was not liable as a principal because the evidence did not prove that Ayala and Branson agreed to any plan (Doc. 8-3 at 299–302):

<table>
<tr><td>[Trial counsel:]</td><td>[T]o follow up on that, I want you to remember back to our very first witness, practically the first thing he said, Mr. Morton, this morning. Mr. Morton testified that when this individual got out of the car, and the car drove away, that being Mr. Branson, he started to go towards the Macy's store. And then it seemed like he changed his mind and went back towards where they were and asked if he could have some help — or asked if he could offer some help.</td></tr>
<tr><td></td><td>Ladies and gentlemen, then you heard from Mr. Branson, one of the later witnesses. Mr. Branson testified, yeah, he really was planning — he was actually planning to go into the Macy's store and maybe shoplift something. That was what he was planning.</td></tr>
<tr><td></td><td>And then he noticed this gentleman helping the lady and a fanny pack there in the car, and he changed his mind, so he could steal that.</td></tr>
<tr><td></td><td>He said it was a spur-of-the-moment thing, no plan, no plan even in his own mind, just opportunity, so to speak. So, he's — he took that opportunity, and he did something that he himself didn't even plan to do.</td></tr>
<tr><td></td><td>That's a fact. And it's attested to both by — Mr. Morton's personal observation and, from the other side of the — of the fence, Mr. Branson's own testimony of what he was thinking, totally mesh and support one another.</td></tr>
</table>

Based on that, ladies and gentlemen, this
gentleman here, Mr. Manuel Ayala, could
not have been a principal in
Mr. Branson's plan because Mr. Branson
didn't have a plan. That is a fact.

The first state witness and the first
defense witness totally agreed,
corroborated, and supported each other.
Both of them testified that Mr. Branson
was going towards the Macy's and then
suddenly swerved over to where this car
was.

Without Mr. Ayala being involved in the
plan, he can't be a principal. You have to
be part of the plan, the intent of — of — of
the crime, to be a principal in it.

And it's true. Obviously, a principal can
be prosecuted. You see organized crime all
the time. The big boss man tells the guys
what to do. Or they sit around; they make
a plan. Obviously, you can be convicted of
being a principal. You don't have to be
there.

But just because it's possible doesn't mean
the State has proven it. The State has
termed it a curiosity. But, ladies and
gentlemen, it doesn't match up with their
own facts. Their own eyewitnesses at the
scene indicate[ ] it wasn't a plan.

But if — even if that was — all we had
was Mr. Branson — or pardon me —
Mr. Morton testifying about that, that
would show — that's not evidence of a
plan when someone changes their mind.
Okay?

But we also had, from Mr. Branson's own
perspective, him telling you freely, it was
not a plan.

Because Ayala failed to present any evidence that he and Branson had a common unlawful purpose to purchase or sell drugs, Ayala was not entitled to an independent act instruction. *Boyd v. State*, 912 So. 2d 26, 27 (Fla. 4th DCA 2005) ("Boyd's defense was not that he had previously participated in a common plan and the acts of the co-felon were outside of and were foreign to the common design of the original collaboration. Boyd's defense was that there was no common plan between him and Flanagan, Flanagan's act of armed robbery came as a complete surprise to Boyd, and Boyd was in no way involved in the armed robbery."). *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000) ("[A] reasonable attorney could have concluded that a theory of self-defense was inconsistent with Petitioner's own description of the killing. The reasonableness of an attorney's acts can depend upon 'information supplied by the defendant' and 'the defendant's own statements or actions.'") (quoting *Strickland*, 466 U.S. at 691).

Even if Ayala was entitled to an independent act instruction, he does not demonstrate a reasonable probability that the outcome at trial would change if the trial judge had instructed the jury on the defense. *Strickland*, 466 U.S. at 694.

Both Branson, a thirteen-time convicted felon, and Ayala, a six-time convicted felon with thirteen convictions for crimes of dishonesty, testified that Ayala drove Branson to the Macy's parking lot for Branson to meet with a female about drugs and money. (Doc. 8-3 at 244–45, 257–59, 265–66, 272) However, during the interrogation, Ayala told the detectives that he only knew that Branson

"was going to do something" or "some kind of criminal act" but did not know what crime Branson planned to commit. (Doc. 8-3 at 163) Ayala did not mention anything to the detective about the female, the drugs, and the money. (Doc. 8-3 at 276–77)

During his testimony at trial, Branson denied that, when he returned to the car, he told Ayala that he stole the purse and claimed that he instead told Ayala that the credit cards belonged to the female whom he just met. (Doc. 8-3 at 250–53) During his testimony, Ayala denied that Branson said that the credit cards were stolen and claimed that Branson instead said "one of [Branson's] drug sources" gave him the credit cards. (Doc. 8-3 at 267–68) However, during the interrogation, Ayala told the detectives that Branson returned to the car "huffing and puffing," directed Ayala to drive away, and told Ayala that he had just snatched a purse. (Doc. 8-3 at 160–61) Also, Ayala told the detectives that, while stopped at a traffic light, Ayala observed Branson dump out the contents of the purse, including credit cards, Social Security cards, and identification cards that belonged to a male and a female. (Doc. 8-3 at 160) Ayala told the detectives that Branson said that, when he snatched the purse, he told the male, "I have to have that," and the male responded, "Oh no, you don't, you bastard." (Doc. 8-3 at 158–59) Ayala did not mention to the detective anything about the female or a "drug source."

Both Branson and Ayala testified that Ayala owed Branson money for a botched drug deal and that Branson threatened Ayala and Ayala's family if Ayala

refused to use the credit cards to purchase items at Walmart. (Doc. 8-3 at 242–44, 246–47, 249, 258–60, 263, 266–68) During the interrogation, Ayala did not mention to the detective anything about the botched drug deal or Branson's threats directed at Ayala and Ayala's family.

After hearing this contradictory and confusing testimony about critical facts by two convicted felons, a reasonable juror would reject the independent act defense. Because Ayala failed to demonstrate prejudice under *Strickland*, the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."). *Pearce v. State*, 880 So. 2d 561, 569 (Fla. 2004) ("The theory of admissibility is not that the prior statement is true and the in-court testimony is false, but that because the witness has not told the truth in one of the statements, the jury should disbelieve both statements."); *Hawn v. State*, 300 So. 3d 238, 242 (Fla. 4th DCA 2020) ("'[A]n omission in a previous out-of-court statement about which the witness testifies at trial' can be considered an inconsistent statement for impeachment purposes, if the omission is a 'material, significant fact rather than mere details and would naturally have been mentioned.'") (citation omitted); *Bobb v. State*, 647 So. 2d 881, 883 (Fla. 4th DCA 1994) ("[T]he theory supporting the admissibility of a wide variety of convictions is that 'a person with a criminal record has demonstrated a willingness to violate the

law, which bears upon the person's willingness to disregard the oath to tell the truth.'").  Ground Two is denied.

## **Ground Three**

Ayala asserts that trial counsel deficiently performed by not objecting to allegedly improper comments by the prosecutor during closing argument. (Docs. 1 at 8 and 2 at 24–30)  The post-conviction court denied the claim as follows (Doc. 8-4 at 239) (state court record citations omitted):

> Defendant argues that trial counsel was ineffective for failing to object to improper comments made by the State during closing arguments. The Court does not find that the statements were improper or bolstering.

### **Comment One**

Ayala asserts that trial counsel should have objected to the following comment by the prosecutor (Doc. 8-3 at 292) (bolding added):

> [Prosecutor:]   And another curiosity is the defendant, who gave a statement to police, just so happened to use almost the exact same words as Ronald Morton. But yet, he claims he didn't know anything about a purse stealing. Right?
>
> That's not a coincidence that he just so happened to use almost the exact same phrase as Mr. Morton in his taped statement. That can't be a coincidence. **That just doesn't make sense. And when things don't make sense, it's because they're not true.**
>
> **He was able to recite almost exactly what Mr. Morton said because that's what Mr. Branson told him when he got back to the car. And if he's lying**

**about that, then he could be lying about anything.**

You're going to hear an instruction from the court that — on why it's important that you know if someone's been convicted of felonies and crimes of dishonesty. And the defendant's not even sure how many he has. The reason — but we know it's at least a total of thirteen.

The reason that's important is you've got to consider the source. Consider who's — you don't know anybody in this case. So, you take every single witness that you've heard from, and you can do the same evaluation, not just the defendant, but my witnesses too. You can make that judgment for yourself. And why it's important — because it goes to their credibility.

At trial, Morton testified that a male opened the driver's side door of Morton's car, grabbed the fanny pack that belonged to Morton's mother, and said, "Excuse me, ma'am, but you're not going to be needing this anymore." (Doc. 8-3 at 131) Morton responded, "Oh, no you don't," and the male replied, "Oh, yes, I do," and ran away. (Doc. 8-3 at 131–32) During the interrogation, Ayala told the detective that Branson returned to the car with the black purse and told Ayala that he had snatched the purse. (Doc. 8-3 at 158, 160) According to Ayala, Branson said that he told the woman who owned the purse, "I have to have that," and a male responded, "Oh, no you don't, you bastard." (Doc. 8-3 at 158–59) Because both Morton and Ayala said that Morton told Branson, "Oh, no you don't," the prosecutor fairly

argued that Ayala did not coincidentally "use almost the exact same words as Ronald Morton."  (Doc. 8-3 at 292)

During the interrogation, Ayala told the detective that Branson removed from the stolen purse credit cards, Social Security cards, and identification cards that belonged to a male and female.  (Doc. 8-3 at 158, 160)  At trial, Ayala testified that Branson told him that the credit card that Ayala used at Walmart "was freely given to [Branson] by one of his drug sources."  (Doc. 8-3 at 267)  Because Ayala's statements to the detective during the interrogation contradicted his testimony at trial, the prosecutor impeached Ayala with his statements to the detective. § 90.608(1), Fla. Stat.  Because the prosecutor's description of Ayala as a liar was based on that impeachment, an objection to the prosecutor's comment would not have succeeded.  Consequently, trial counsel did not deficiently perform.  *Craig v. State*, 510 So. 2d 857, 865 (Fla. 1987) ("When counsel refers to a witness or a defendant as being a 'liar,' and it is understood from the context that the charge is made with reference to testimony given by the person thus characterized, the prosecutor is merely submitting to the jury a conclusion that he is arguing can be drawn from the evidence.").

**Comment Two**

Ayala asserts that trial counsel should have objected to the following comment by the prosecutor (Doc. 8-3 at 310) (bolding added):

> [Prosecutor:]          Now, the defendant claims — defense
>                        claims that he was so tired when he gave

> that statement to police that I guess it wasn't true. I guess that's what you're supposed to take from that.
>
> But the real truth is what the convicted felon, Michael Branson, told you and what he told you when he testified, which is the opposite of everything he said when questioned by police. Okay?
>
> **Because when he's questioned by police — and what's curious — and I didn't mean that in a way that the defense tried to say it. I meant it in a way to point out how absurd the defendant's story is, what I submit to you are complete lies.**
>
> What's so strange is that his statement to police right after the theft occurred happens to be virtually identical to the testimony of Mr. Morton as to what was said during the commission of this robbery.

During trial, Ayala testified that he dropped Branson off at the Macy's parking lot because Branson "was going to go see some girl about some money and some dope." (Doc. 8-3 at 257) During the interrogation, Ayala did not mention to the detectives anything about the female, the drugs, or the money. (Doc. 8-3 at 163) During trial, Ayala testified that Branson said that the credit card that Ayala used at Walmart "was freely given to [Branson] by one of his drug sources." (Doc. 8-3 at 267) During the interrogation, Ayala told the detectives that Branson admitted that he had snatched the purse, and that Branson removed from the stolen purse credit cards, Social Security cards, and identification cards that belonged to a male and female. (Doc. 8-3 at 158, 160) During trial, Ayala testified

that he did not know that Branson intended to snatch the purse.  (Doc. 8-3 at 263) During the interrogation, Ayala told the detectives that he knew that Branson "was going to do some kind of criminal act that [he] didn't want to be a part of."  (Doc. 8-3 at 163)

Because the prosecutor's description of Ayala's testimony as "complete lies" was based on the contradictions between Ayala's testimony at trial and his statements during the interrogation, an objection to the comment would not have succeeded.  Consequently, trial counsel did not deficiently perform.  *Craig*, 510 So. 2d at 865.

### Comment Three

Ayala asserts that trial counsel should have objected to the following comment by the prosecutor (Doc. 8-3 at 311–13) (bolding added):

|  |  |
|---|---|
| [Prosecutor:] | Members of the jury, the theft occurred on October 7th, 2010. A few days later, on October 12th, 13th, the defendant gives the statement to police. Okay? |
|  | And in that statement, he recalls what he was told by the defendant, Michael Branson, on October 7th. And what he says, very clearly, are words almost identical to what Mr. Morton testified to. |
|  | Doesn't say anything about a drug deal. Doesn't say anything about the purse coming from a drug girl at the Macy's parking lot. Doesn't say anything about that. |
|  | **That would have been the time to say it. But he doesn't. Why? Because it's not true.** |

When the truth is — they went there to rob people. And they robbed Bobbie Morton. They found their victim. One guy did the grab; one guy drove the car. Very simple. Okay?

And why — if Michael Branson is saying that the defendant owed him money, why would Michael Branson be the one that grabs that stuff? Why not send him to do it? **Doesn't make sense. Right? Because it's not true.**

Defendant stated in his statement to police, which — you're to believe that he was so tired and — and so interrogated that he didn't know what he was saying, but seems to match the facts exactly as Mr. Morton said: That he came. He reached the car. He had a purse in his hand, referring to the — the co-defendant.

You know, he was saying that he said — he stated he had to have it. And the old gentleman says, "Oh, no, you don't, you bastard."

Okay. He also says in that statement that Michael Branson showed up huffing and puffing. Well, why would he be huffing and puffing? Why would he be exhausted if he just got this from his drug girl? Doesn't make sense because it's not true.

As explained above, at trial, Ayala testified that Branson said that he planned to meet with a female about drugs and money in the Macy's parking lot. (Doc. 8-3 at 257)  During the interrogation, Ayala did not mention to the detectives anything about the female, the drugs, or the money.  (Doc. 8-3 at 163)  Because the

38

prosecutor properly impeached Ayala with that omission, an objection would not have succeeded.  *Hawn*, 300 So. 3d at 242.

Also, during trial, Ayala testified that, after the theft, Branson returned with credit cards and demanded that Ayala use the credit cards to purchase items because Ayala owed money to Branson.  (Doc. 8-3 at 258–59)  Because the prosecutor reasonably argued from the evidence that Branson would have insisted that Ayala commit the theft if Ayala owed Branson money, an objection to that comment would not have succeeded either.  Consequently, trial counsel did not deficiently perform.  *Kirkpatrick v. State*, 346 So. 3d 687, 695 (Fla. 1st DCA 2022) ("[P]rosecutors have wide latitude in closing argument to argue and to draw reasonable inferences from the evidence.").  Ground Three is denied.

**Ground Four, Ground Five, and Ground Ten, Sub-Claim A**

In Ground Four, Ayala asserts that the prosecutor violated his federal right to due process by conspiring with two detectives to alter the transcript of the interrogation.  (Doc. 2 at 31–37)  In Ground Five, Ayala asserts that the trial judge violated his right to counsel by appointing him an attorney who represented him with an actual conflict of interest.  (Doc. 2 at 37–41)  In Ground Ten, Ayala asserts that the trial judge violated his federal right to due process by instructing the jury on crimes not charged in the information and by entering the judgment without jurisdiction ("sub-claim A") and that trial counsel deficiently performed by not

objecting to the defective information and jury instructions and to the trial judge's lack of jurisdiction ("sub-claim B").

The Respondent contends that Ayala failed to exhaust his remedies in state court for the claims in Ground Four and Ground Five and sub-claim A in Ground Ten. (Doc. 8 at 16–17, 19, 29) On direct appeal, Ayala failed to raise these claims of trial error. (Doc. 8-2 at 6–22) If Ayala returned to state court to exhaust his remedies, the post-conviction court would deny the claims as procedurally barred. Fla. R. Crim. P. 3.850(c) ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence."). Consequently, the claims are procedurally barred on federal habeas unless Ayala can demonstrate either cause and prejudice or a miscarriage of justice based on actual innocence. *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37; *Snowden*, 135 F.3d at 736.

Ayala admits that he did not exhaust his remedies in state court but argues that *Martinez v. Ryan*, 566 U.S. 1 (2012), permits review. (Doc. 1 at 10) However, "the equitable rule established in *Martinez* applies only 'to excusing a procedural default of ineffective-trial-counsel claims' and, for that reason, has no application to other matters . . . ." *Chavez v. Sec'y, Fla. Dep't Corrs.*, 742 F.3d 940, 945 (11th Cir. 2014) (citation omitted). Because Ayala asserts claims of trial error, Ground Four, Ground Five, and sub-claim A in Ground Ten are dismissed as procedurally barred.

**Ground Six:**

Ayala asserts that trial counsel deficiently performed by not requesting that

the trial judge instruct the jury on trespass and accessory after the fact as lesser

included offenses. (Docs. 1 at 11 and 2 at 41–42) Ayala admits that he did not

exhaust his remedies in state court but contends that *Martinez* permits review.

(Doc. 1 at 10) *Martinez*, 566 U.S. at 14, held that a petitioner may establish cause

by demonstrating that an attorney did not represent him during the post-conviction

proceedings and may establish prejudice by demonstrating that the defaulted claim

has "some merit." Because an attorney did not represent Ayala during state

post-conviction proceedings (Doc. 8-4 at 166–82), review will proceed to the merits of

the claim.

An information charged Ayala with burglary of an occupied conveyance,

robbery by sudden snatching, and fraudulent use of a credit card. (Doc. 8-2 at

179–80) During the charge conference, trial counsel refused an instruction on

trespass as a lesser offense of burglary because he "[didn't] think [the instruction]

really fit[ ] the facts of this case." (Doc. 8-3 at 217)

Trespass is a permissive lesser included offense of burglary of an occupied

conveyance. Fla. Std. Jury Instr. (Crim.) 13.1. "When requested by the defendant,

an instruction on a [ ] permissive lesser-included offense must be given where

'(1) the information alleges all of the statutory elements of the permissive lesser-

included offense, and (2) there is some evidence adduced at trial establishing all of

the elements.'" *Piccioni v. State*, 833 So. 2d 247, 248 (Fla. 4th DCA 2002) (citation omitted).  "'Even if the evidence is overwhelming that the defendant is guilty of the crime with which he is charged, the court must give a charge on a lesser included offense as to which there is any evidence.'" *Piccioni*, 833 So. 2d at 248.

Even if the trial judge would have granted trial counsel's request for an instruction on trespass as a lesser offense, Ayala cannot demonstrate prejudice under *Strickland*.  Florida Standard Criminal Jury Instruction 3.12, requires a trial judge to instruct:  "If you return a verdict of guilty, it should be for the highest offense on the verdict form that has been proven beyond a reasonable doubt."  The jury determined that the prosecutor proved every element of burglary of an occupied conveyance, the greater offense.  (Doc. 8-2 at 203)

Under *Strickland*, 466 U.S. at 695, "[t]he assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."  *Sanders v. State*, 946 So. 2d 953, 959 (Fla. 2006), held that "any finding of prejudice resulting from defense counsel's failure to request an instruction on lesser-included offenses necessarily would be based on a faulty premise:  that a reasonable probability exists that, if given the choice, a jury would violate its oath, disregard the law, and ignore the trial court's instructions."

Even with the instruction for trespass as a lesser offense, the jury would have complied with Florida Standard Criminal Jury Instruction 3.12 and determined

that the prosecutor proved every element of burglary of an occupied conveyance, the greater offense.  Consequently, Ayala cannot demonstrate a reasonable probability that the outcome at trial would have changed if the trial judge had instructed the jury on trespass, the lesser offense.  *Sanders*, 946 So. 2d at 959–60 ("[W]e [ ] 'have difficulty accepting the proposition that there is even a substantial *possibility* that a jury which has found every element of an offense proved beyond a reasonable doubt, would have, given the opportunity, ignored its own findings of fact and the trial court's instruction on the law and found a defendant guilty of only a lesser included offense.'") (citation omitted and italics in original).

Also, because the information did not charge Ayala with acting as an accessory after the fact (Doc. 8-2 at 179–80), trial counsel did not deficiently perform by not requesting an instruction for that uncharged, separate offense. *Anderson v. State*, 574 So. 2d 87, 94 (Fla. 1991).  Because Ayala fails to demonstrate that the claim has "some merit" under *Martinez*, Ground Six is dismissed as procedurally barred.

**<u>Ground Seven:</u>**

Ayala asserts that trial counsel deficiently performed by not objecting to the admission of his statements during the interrogation.  (Doc. 1 at 11)  He contends that trial counsel challenged only his statements to police at a restaurant before his arrest and failed to challenge his statements during the interrogation at the police station.  (Doc. 2 at 43–45)  He contends that an investigation would have revealed

that a detective coerced and fabricated his statements. (Docs. 1 at 11 and 2 at 43–47) Ayala admits that he did not exhaust his remedies in state court but contends that *Martinez* permits review. (Doc. 1 at 10)

Before asking Ayala questions at the police station, a detective read aloud to Ayala his *Miranda*[3] rights and presented to Ayala a form that listed those rights. (Doc. 8-2 at 90) The detective asked Ayala to write his initials next to each right, sign his name, and write the date. (Doc. 8-2 at 90–91) Ayala confirmed that he agreed the speak with the detectives. (Doc. 8-2 at 91) Both the transcript of the interrogation and the audio recording demonstrate that the detectives did not threaten Ayala or promise him anything and that, even though Ayala yawned and complained that he was tired, Ayala clearly and coherently spoke to the detectives. (Doc. 8-2 at 90–110) Because the detective advised Ayala of his *Miranda* rights, an objection based on coercion would not have succeeded. *Colorado v. Spring*, 479 U.S. 564, 576 (1987) ("Once *Miranda* warnings are given, it is difficult to see how official silence could cause a suspect to misunderstand the nature of his constitutional right — his right to refuse to answer any question which might incriminate him. Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled.") (citations and internal quotations omitted).

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

A comparison of the trial transcripts with transcripts of the interrogation demonstrates that the court reporter at trial may have incorrectly attributed a statement to Ayala. A detective commented, "I mean — because it just seems odd that you would — you would just drop somebody off at the Macy's parking lot," and the trial transcript shows that Ayala responded, "Right." (Doc. 8-3 at 162) However, the transcript of the interrogation and the audio recording reveal that another detective responded, "Right, I mean, let's be honest . . . ." (Docs. 8-4 at 200 and 26) When the prosecutor published the audio recording of the interrogation to the jury, the prosecutor only played the recording and did not provide the jurors a transcript. (Doc. 8-3 at 156) Because the jurors drew their own conclusion about who spoke during the recording of the interrogation, an objection based on a fabrication of evidence would not have succeeded.

Also, as explained in the review of Ground One, during the interrogation, just after a discussion of the third purse snatching, which also occurred in the Macy's parking lot, the detective asked Ayala why he went to the parking lot. (Doc. 8-3 at 162) Ayala responded that he enjoyed driving. (Doc. 8-3 at 162) Even though the redacted recording may have misled the jurors to believe that the detective's question referred to the second purse snatching, charged in this case, Ayala's response was exculpatory. Also, even though the remaining statements in the redacted recording referred to both the second and third purse snatchings, the

statements about both purse snatchings were inextricably intertwined.  *Richardson*, 338 So. 3d at 1117.

Lastly, Ayala argues that further investigation would have revealed that the prosecutor altered his statements during the interrogation.  (Doc. 2 at 43–45)  He contends that the audio recording of the entire interrogation would have exonerated him at trial.  (Doc. 2 at 44)  However, in the unredacted transcript and audio recording of the interrogation, Ayala confessed to participating in at least two other purse snatchings.  (Docs. 2-1 at 18–37 and 26)  In the first purse snatching, which occurred in the First Mortgage Bank's parking lot, Ayala admitted to observing Branson snatch the purse from a female.  (Doc. 2-1 at 19)

Also, Ayala explained that he used the credit card at Walmart after the first purse snatching because Branson owed money to a drug dealer (Doc. 2-1 at 21–22):

| [Detective:] | Okay, what was your motivation to do this, I mean, why were you, why did you go to the — if you knew that he, after he got done, you know, doing the purse, why did you go[ ] to Walmart with him and use the cards? |
| --- | --- |
| [Ayala:] | Well, he directed me to go Walmart. |
| [Detective:] | Are you scared of him, I mean, when you say, directed, is he like, you got to explain that. |
| [Ayala:] | Well, he's, he, he was, because we were friends, is what [it] is, because he owed money that I was responsible for, but they made, because it was in my rent that he took the dope, the dope from. |
| [Detective:] | Okay. |

[Ayala:]            You know, they credited him.

[Detective:]        Who credited him?

[Ayala:]            A drug dealer name[d] E.T.

[Detective:]        Do you have E.T.'s real name?

[Ayala:]            No, sir.

[Detective:]        Is he from around here?

[Ayala:]            Yes, sir.

[Detective:]        Okay, and what did he credit him?

[Ayala:]            He credited him some dope.

[Detective:]        How much?

[Ayala:]            [F]ive-hundred dollars' worth.

[Detective:]        Of what, crack, meth?

[Ayala:]            Crack.

[Detective:]        Crack.

[Ayala:]            Yeah, so.

[Detective:]        Okay, and he put it under your name?

[Ayala:]            Excuse me, no.

[Detective:]        You said that he put it under.

[Ayala:]            Because he was in my room.

[Detective:]        [Uh, huh.]

[Ayala:]            You know, what I'm saying, E.T. just said, well this is on your face.

[Detective:]        Okay.

> [Ayala:]         You know, and by that time, it was already, um, it was already done, it was a done dollar, you know.

At trial, Ayala did not mention anything about a drug dealer named "E.T." or any threats or demands by "E.T." and instead testified that Branson threatened him, demanded money from him, and accused him of stealing drugs after he delivered drugs for Branson.

Ayala fails to explain how the unredacted recording of the interrogation would exonerate him at trial. After learning that Ayala participated in two other purse snatchings and that Ayala contradicted himself during the interrogation about facts that supported a duress defense, a reasonable juror would have more likely convicted Ayala of the purse snatching charged in this case. Ayala fails to submit any additional evidence that demonstrates that the detectives coerced or fabricated his statements. "Speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation." *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985).

Consequently, Ayala fails to demonstrate deficient performance and prejudice under *Strickland*. *Strickland*, 466 U.S. at 687. Because Ayala fails to demonstrate that the claim has "some merit" under *Martinez*, Ground Seven is dismissed as procedurally barred.

**<u>Ground Eight:</u>**

Ayala asserts that trial counsel deficiently performed by not investigating eight witnesses and presenting their testimony at trial. (Doc. 1 at 11–12) He

contends that testimony by the witnesses would have supported a defense of duress at trial.  (Docs. 1 at 11–12 and 2 at 47–52)  Ayala admits that he did not exhaust his remedies in state court but contends that *Martinez* permits review.  (Doc. 1 at 10)

"[*Strickland*'s prejudice] burden is particularly 'heavy where the petitioner alleges ineffective assistance in failing to call a witness because often allegations of what a witness would have testified to are largely speculative.'" *McKiver v. Sec'y, Fla. Dep't Corrs.*, 991 F.3d 1357, 1365 (11th Cir. 2021) (quoting *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006)).  "[F]or that reason, [the Eleventh Circuit has] held that a petitioner's own assertions about whether and how a witness would have testified are usually not enough to establish prejudice from the failure to interview or call that witness." *McKiver*, 991 F.3d at 1365.  Because Ayala fails to submit an affidavit or other testimony by a witness to support his claim and instead speculates that each witness was available and would testify in the manner that he contends, his claim fails.  *Aldrich*, 777 F.2d at 636.

Also, at trial, both Ayala and Branson testified that Branson threatened to harm Ayala and Ayala's family if Ayala refused to use the credit card at Walmart. (Doc. 8-3 at 243–44, 246–47, 249, 259–60, 267–68)  Because the proposed testimony by the additional witnesses is "largely cumulative" to the testimony that Ayala presented at trial, Ayala fails to demonstrate prejudice under *Strickland*. *Guardado v. Sec'y, Fla. Dep't Corrs.*, 112 F.4th 958, 984 (11th Cir. 2024) ("[E]vidence presented in post-conviction proceedings is 'cumulative' or 'largely

cumulative' to . . . that presented at trial when it tells a more detailed version of the same story . . .[,] provides more or better examples[,] or amplifies the themes presented to the jury.") (citation and internal quotations omitted). Because Ayala fails to demonstrate that the claim has "some merit" under *Martinez*, Ground Eight is dismissed as procedurally barred.

## **Ground Nine:**

Ayala asserts that trial counsel deficiently performed by not investigating and discovering exculpatory statements by two witnesses. (Doc. 1 at 12) ("Sub-claim A") Ayala further asserts that the prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the allegedly exculpatory statements by the two witnesses. (Doc. 2 at 55–56) ("Sub-claim B") Ayala admits that he did not exhaust his remedies in state court but contends that *Martinez* permits review. (Doc. 1 at 10)

### **Sub-claim A**

Ayala asserts that trial counsel deficiently performed by not investigating and discovering exculpatory statements by two witnesses. (Doc. 1 at 12) He contends that trial counsel failed to discover that two clerks who worked at a hotel told police that Branson threatened other guests at the hotel with a firearm. (Doc. 2 at 52–53) He contends that these statements by the clerks would have corroborated his claim that he assisted Branson with the crime only because Branson threatened him with a firearm. (Doc. 2 at 53–55)

Attached to his petition is a police report that states that a police officer went

to a motel to interview two clerks who identified Ayala and Branson (Doc. 2-1

at 177):

> While we were in the process of the stated task, I was
> contacted by Sergeant Session and instructed to respond to the
> Ranch House, which is located at 1911 Cypress Gardens
> Boulevard in Winter Haven, Florida. Upon arrival at this
> location, Detective Alderman and I met with several members
> of the Polk County Sheriff's Office who were also tasked with
> obtaining an identification of the white male suspect in the
> surveillance video.
>
> I learned Kenny Simmons and Melissa Pressnell (night clerk[s]
> at the Ranch House) may have information on the suspect we
> were looking for. Simmons and Pressnell were interviewed and
> stated they did rent two room[s] to an individual named
> "Manuel Ayala" or "Antonio Manuel" of 1604 High Point Court
> Southwest in Winter Haven (see copies of room receipts). This
> subject was seen with the white male in the surveillance video
> with the tattoos on his arms. Manuel Ayala was later identified
> as another suspect we were looking for in regards to the
> robberies and currently had a Blue 2005 Ford Taurus
> registered to him. This vehicle matched the description of the
> vehicle used in several of the robberies.
>
> During the interview with Kenny Simmons and Melissa
> Pressnell, they advised that an altercation occurred while
> Ayala and the tattooed white male were staying at the hotel.
> Simmons and Pressnell stated that during the altercation, the
> white male with the tattoos was armed with a pellet gun that
> resembles a real firearm. It was reported the firearm was later
> located behind the hotel in the grass by Christopher Swanson.
> Swanson was located and admitted he had contact with the
> white male with the tattoos and he requested his pellet gun
> back. Swanson stated he gave the pellet gun back to the white
> male and stated Detective Madden and I could even search his
> room for the pellet gun.

In his petition, Ayala states that trial counsel knew before trial that

Simmons and Pressnell told police about Branson's firearm.  (Doc. 2 at 55)  Ayala

attaches to his petition a report by an investigator to trial counsel summarizing an interview with Ayala.  (Doc. 2-1 at 179–81)  Ayala told the investigator that he observed Branson armed with a black semiautomatic firearm.  (Doc. 2-1 at 181)  Also, Ayala attaches a handwritten note by trial counsel to the investigator.  (Doc. 2-1 at 183)  Trial counsel told the investigator that Simmons and Pressnell worked at the motel and had observed Branson threaten Ayala with a firearm.  (Doc. 2-1 at 183)

Ayala asserts that trial counsel deficiently performed by failing to investigate and call Simmons and Pressnell to testify at trial (Doc. 2 at 55):

> Counsel did know about Branson having a gun and threatened Defendant with this gun. Counsel also knew about Kenneth Simmons and Melissa Pressnell witnessing Branson's threats against people with the firearm. But counsel did nothing to reveal these critical facts in Defendant's defense, even though counsel was in possession of this information prior to trial [and] the suppression hearing, since February 2011.

Ayala does not present any evidence that Simmons and Pressnell were available to testify at trial.  Also, the police report does not state that Simmons and Pressnell observed Branson threaten Ayala or anyone else with a firearm.  The report states that Simmons and Pressnell observed an "altercation" during Ayala's stay at the hotel and observed Branson armed with a pellet gun that resembled a firearm during the "altercation."  (Doc. 2-1 at 177)  Because Simmons and Pressnell did not observe Branson threaten Ayala or anyone else with a firearm and Ayala instead speculates that Simmons and Pressnell would testify in the manner that he contends, Ayala fails to demonstrate prejudice under *Strickland*.  *Aldrich*, 777 F.2d

at 636.  Also, any testimony by Simmons and Pressnell about threats by Branson toward Ayala is "largely cumulative" to testimony that Ayala presented at trial. *Guardado*, 112 F.4th at 984.  Because Ayala fails to demonstrate that the claim has "some merit" under *Martinez*, sub-claim A is dismissed as procedurally barred.

### Sub-claim B

Ayala asserts that the prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the allegedly exculpatory statements by Simmons and Pressnell.  (Doc. 2 at 55–56)  Because "*Martinez* applies to defaulted ineffective-assistance-of-*trial*-counsel claims only and not [ ] to *Brady* claims," sub-claim B is dismissed as procedurally barred.  *Hamm v. Comm'r, Ala. Dep't Corrs.*, 620 F. App'x 752, 783 (11th Cir. 2015) (italics in original).[4]

## Ground Ten, Sub-claim B:

Ayala asserts that that trial counsel deficiently performed by not objecting to an amendment to the information.  (Doc. 2 at 56–58)  He contends that, because the prosecutor erroneously amended the information, the trial judge lacked jurisdiction over the prosecution and gave instructions to the jury for crimes that were not charged in a properly filed information.  (Doc. 2 at 56–58)  Ayala admits that he did not exhaust his remedies in state court but contends that *Martinez* permits review. (Doc. 1 at 10)

---

[4] 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

An initial information charged Ayala with fraudulent use of a credit card as follows (Doc. 8-2 at 64):

> Informant aforesaid, under oath, further information makes that Manuel Antonio Ayala, Jr., on or about October 7, 2010, in the County of Polk and State of Florida, did during a six-month period, with intent to defraud, obtain money, goods, property, or services of a value of $100.00 or more, by representing that he was the holder of a credit card, which had been issued to Bobbie Morton, without consent of Bobbie Morton, contrary to Florida Statute 817.61. (3 DEG FEL) (LEVEL 2)

An amended information charged the crime as follows (Doc. 8-2 at 179) (identifying amendment with bolding):

> Informant aforesaid, under oath, further information makes that Manuel Antonio Ayala, Jr., on or about October 7, 2010, in the County of Polk and State of Florida, did during a six month period, **with intent to defraud, obtain money, goods, property, or services, use the credit card of Bobbie Morton two or more times, or** with intent to defraud, obtain money, goods, property, or services of a value of $100.00 or more, by representing that he was the holder of a credit card which had been issued to Bobbie Morton, without the consent of Bobbie Morton, contrary to Florida Statute 817.61. (3 DEG FEL) (LEVEL 2)

The amended information conformed with testimony by an asset protection manager at Walmart that, on October 7, 2010, Ayala used Morton's credit card to purchase items for $29.58 and unsuccessfully attempted to use the credit card three more times to purchase additional items. (Doc. 8-3 at 174–82)

Ayala contends that, because the prosecutor "amended [the] information after the jury was sworn and empanelled," the amended information was "nullif[ied]," and the initial information was dismissed. (Doc. 1 at 12) He contends that a prosecutor must amend the information before the state court clerk administers the

oath to the jurors by formally presenting the amended information to the trial judge in court.  (Doc. 2 at 56–58)

The record demonstrates that, on July 8, 2013, in the afternoon, jury selection occurred.  (Doc. 8-3 at 35)  On July 10, 2013, the prosecutor filed the amended information, the state court clerk administered the oath the jurors, and the trial began. (Docs. 8-2 at 179–81 and 8-3 at 110–11)  The record does not demonstrate whether the prosecutor amended the information before or after trial began.  If the amendment occurred before trial, the prosecutor does not need permission from the trial judge to amend the information.  *State v. Mulvaney*, 200 So. 3d 93, 95 (Fla. 5th DCA 2015) ("'[T]he State has the right to amend an information without leave of court, and the filing of a signed and sworn amended information has the legal effect on the original information of a *nolle prosequi*.'") (quoting *State v. Belton*, 468 So. 2d 495, 497 (Fla. 5th DCA 1985)).  Because Ayala speculates that the amendment occurred after trial began, he is not entitled to relief.  *Aldrich*, 777 F.2d at 636.

"[O]nce a trial commences, the State cannot amend the information without leave of court, and the court cannot grant leave to amend the information during trial if doing so would 'prejudice . . . the substantial rights of the defendant.'" *State v. Clements*, 903 So. 2d 919, 922 (Fla. 2005) (quoting *State v. Anderson*, 537 So. 2d 1373, 1375 (Fla. 1989)).  If a prosecutor fails to move for leave to amend the

information during trial, the amended information does not become effective, and the initial information "remain[s] in effect." *Clements*, 903 So. 2d at 922.

Both the initial information and the amended information charged Ayala with fraudulent use of a credit card in violation of Section 817.61, Florida Statutes. (Doc. 8-2 at 64, 179)  A person who violates Section 817.61 may commit either a third-degree felony or a first-degree misdemeanor.  A person who fraudulently uses a credit card more than two times during a period of six months and obtains money, goods, property, or services worth more than $100.00 commits a third-degree felony. §§ 817.61 and 817.67(2), Fla. Stat. (2010).  A person who fraudulently uses a credit card two or fewer times during a period of six months and obtains money, goods, property, or services worth less than $100.00 commits a first-degree misdemeanor. §§ 817.61 and 817.67(1), Fla. Stat. (2010).

The initial information alleged that Ayala violated Section 817.61 on October 7, 2010, by obtaining money, good, property, or services worth more than $100.00 during a period of six months.  (Doc. 8-2 at 64)  The initial information identified the crime as a "3 DEG FEL," or a third-degree felony.  (Doc. 8-2 at 64)  The amended information alleged that Ayala violated the same statute on the same date in the same manner but added that Ayala used the credit card "two or more times.[5]"

---

[5] Under Section 817.61, Florida Statutes (2010), a person commits a third-degree felony if the person fraudulently uses the credit card "more than two times." In his petition, Ayala does not challenge this discrepancy between the language in the statute and the allegation in the amended information. Therefore, the claim is waived.

(Doc. 8-2 at 179)  Also, the amended information identified the crime as a third-degree felony.  (Doc. 8-2 at 179)

Even if the prosecutor filed the amended information without moving for leave to amend the information, the initial information, which remained the operative charging document, sufficiently charged Ayala with fraudulent use of a credit card.  Because the amended information did not prejudice the substantial rights of Ayala, a motion to dismiss the amended information would not have succeeded.  *DuBoise v. State*, 520 So. 2d 260, 265 (Fla. 1988) ("[T]he failure to include an essential element of a crime does not necessarily render an indictment so defective that it will not support a judgment of conviction when the indictment references a specific section of the criminal code which sufficiently details all the elements of the offense.").  *Clements v. State*, 979 So. 2d 256, 257 (Fla. 2d DCA 2007) ("The Florida Supreme Court held that because the State could not amend the information without permission from the trial court, the second amended information never took effect.") (citing *Clements*, 903 So. 2d at 922).  *State v. Sanders*, 373 So. 3d 960, 962 (Fla. 2d DCA 2023) ("[A]n 'amendment is permissible when it merely clarifies some detail of the existing charge and could not reasonably have caused the defendant any prejudice.'") (citation omitted).

Consequently, the trial judge properly instructed the jury on fraudulent use of a credit card as a third-degree felony, and the trial judge had jurisdiction over the felony prosecution.  § 26.012(2)(d), Fla. Stat. (2010) ("Circuit courts shall have

exclusive original jurisdiction:  Of all felonies and of all misdemeanors arising out of the same circumstances as a felony which is also charged . . . .").[6]

Ayala fails to demonstrate deficient performance and prejudice under *Strickland*.  *Strickland*, 466 U.S. at 694.  *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").  Because Ayala fails to demonstrate that the claim has "some merit" under *Martinez*, sub-claim B is dismissed as procedurally barred.

**<u>Ground Eleven:</u>**

Ayala asserts that trial counsel deficiently performed by not objecting to a habitual felony offender enhancement imposed at sentencing.  (Doc. 1 at 12)  He contends that the trial judge impermissibly relied on a prior conviction for fraudulent use of a credit card to enhance his sentence.  (Doc. 2 at 58–60)  Ayala admits that he did not exhaust his remedies in state court but contends that *Martinez* permits review.  (Doc. 1 at 10)

After determining that Ayala qualified as a habitual violent felony offender at sentencing, the trial judge imposed a five-year mandatory minimum term for the conviction for fraudulent use of a credit card and a ten-year mandatory minimum

---

[6] After resting his case, the prosecutor agreed that the evidence failed to prove that Ayala committed a robbery by sudden snatching and that petit theft, as a lesser offense, applied. (Doc. 8-3 at 208–09) Before closing argument, the trial judge asked the prosecutor for a new information with the lesser charge for petit theft, and the parties instead agreed to not provide the jury with a copy of the information. (Doc. 8-3 at 284, 287)

term for the conviction for burglary of an occupied conveyance.  (Docs. 8-2 at 240–41
and 8-3 at 11)  Before trial, the prosecutor timely notified Ayala that he qualified as
a habitual violent felony offender.  (Doc. 8-2 at 173)

A defendant may qualify as a habitual violent felony offender if the defendant
was previously convicted of an offense listed in subsection (1)(b)(1) of Section
775.084, Florida Statutes, and the defendant committed the new offense within five
years of the date of the conviction for the listed offense or within five years of his
release from a prison sentence for the listed offense.  § 775.084(1)(b), Fla. Stat.
(2010).

At sentencing, a fingerprint examiner testified that Ayala's fingerprints
matched fingerprints on a judgment of conviction in Case Number 01-CF-5149 and
fingerprints on a penitentiary packet.  (Doc. 8-2 at 217–22)  The prosecutor argued
that Ayala qualified as a habitual violent felony offender because of his conviction
for robbery in Case Number 01-CF-5149 (Doc. 8-2 at 235–36):

> [Prosecutor:]   Your Honor, just if I may make a few
> points? The State had served a notice in
> open court to defense counsel and the
> Defendant of its intention to seek
> habitual violent felony offender under
> Florida Statute 775.084(1)(b).
>
> Today, during this hearing, I called — we
> had some certified convictions entered
> into evidence. Fingerprint comparisons
> were done to those certified convictions
> from the Defendant's known prints and it
> showed that the Defendant had
> previously been convicted of a robbery in
> [Case Number] 01-CF-5149, which is

Exhibit 6, which is a qualifying offense for habitual violent felony offender.

Exhibit 7 [ ], which is the penitentiary packet, shows that the Defendant was most recently released from prison on February 4 of 2010. The Defendant's present [offense], as we know, was committed on or about October 7, 2010[.] [T]herefore, the State has established that the Defendant committed the present offense, which he is here to be sentenced on today, within five years of his release from prison on robbery. Robbery, like I said, is a qualifying offense under the habitual violent felony offender statute. And the State recommends that he be sentenced as a habitual violent felony offender.

The trial judge agreed and determined that Ayala qualified as a habitual violent felony offender because of the robbery conviction (Doc. 8-2 at 240):

[Trial judge:]       Alright. I do find that the State did file their notice. It's dated July 5, 2013. I do find that Exhibit 7 shows that there has been no pardon and that his release date was February 4, 2010, and he was convicted of robbery. So, I do find that he does qualify as a habitual violent felony offender.

The trial judge's factual determinations are presumed correct, and Ayala fails to clearly and convincingly rebut those factual determinations. 28 U.S.C. § 2254(e)(1). Robbery is listed as an offense under Section 775.084(1)(b)(1)(c), Florida Statutes (2010). Because an objection to the habitual violent felony offender enhancement would not have succeeded, trial counsel did not deficiently perform. *Strickland*, 466 U.S. at 694. *Pinkney*, 876 F.3d at 1297. Because Ayala fails to

demonstrate that the claim has "some merit" under *Martinez*, Ground Eleven is dismissed as procedurally barred.

**Ground Twelve:**

Ayala asserts that cumulative error justifies relief. (Docs. 1 at 12–13 and 2 at 60) Because no series of errors exists to accumulate, the cumulative-error claim is meritless. *Morris v. Sec'y, Dep't Corrs.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Ground Twelve is denied.

## Conclusion

Because Ayala fails to meet his heavy burden under AEDPA, his petition for a writ of habeas corpus (Doc. 4) is **DENIED**. The Clerk must enter a judgment against Ayala and **CLOSE** the case.

### Denial of Certificate of Appealability and Leave to Appeal *In Forma Pauperis*

Because Ayala fails to show that reasonable jurists would debate either the merits of the underlying claims or the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 29th day of April, 2025.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**